CAROLINE J. BROWN, Plaintiff, v. ANDREW L. HARMON, Defendant.

Vol. 29.
App. Div.
29   31
41   623

*Bill of sale — when the question whether there was an immediate delivery and continued change of possession is for the jury.*

In an action brought by the vendee in a bill of sale of certain goods against a constable, who, after the execution of the bill of sale, had levied upon the property covered thereby under certain attachments and executions against the vendor, it appeared that the bill of sale, which was executed by the vendor at a time when he was being pressed by his creditors and covered all his goods, wares and merchandise and store fixtures, was delivered to the vendee on Friday evening, and that the vendor, after locking the doors, handed the key to the vendee; that on Saturday morning the vendee handed him the key and told him to go to the store and open it and sell the goods that day, and close the store at night, and that on that day he sold goods amounting to between six and seven dollars; that on Monday the vendor again went to the store, put some posters in the window, advertising an auction sale of the goods, and boxed up some of the other goods.

*Held,* that the court erred in refusing to submit to the jury the question whether there was an immediate delivery and an actual and continued change of possession, especially as the evidence on this head came from the vendor and vendee under such circumstances as to warrant the trial judge in submitting the question of their credibility to the jury.

MOTION by the defendant, Andrew L. Harmon, for a new trial upon a case containing exceptions, ordered to be heard at the Appellate Division in the first instance, upon the verdict of a jury in favor of the plaintiff rendered by direction of the court after a trial at the Seneca Trial Term.

*George E. Zartman* and *Frederick L. Manning*, for the motion.

*G. & W. M. Wilcoxen*, opposed.

HARDIN, P. J.:

On the 12th of March, 1897, and prior thereto, the plaintiff resided with her son-in-law, William G. Bancroft, in the village of Waterloo. He had resided in that village since March, 1890, and had been engaged in the business of men's furnishings and hats and caps, at the corner of Main and Virginia streets in the Towsley House Building. On the 12th of March, 1897, he executed and delivered to the plaintiff a bill of sale of his stock of goods. Several days were occupied in preparing an inventory of the goods. The bill of sale recited a consideration of $1,823, and purported to assign to the plaintiff " all of my (his) goods, wares and merchandise and store fixtures contained in the store now occupied by me in the Towsley House Block, in the Village of Waterloo, N. Y."

The bill of sale was delivered to the plaintiff on the evening of the twelfth of March. She was present during a part of the taking of the inventory. The delivery of the bill of sale was a little after nine o'clock in the evening and Bancroft closed the doors, as he usually did, and after locking the doors handed the keys to the plaintiff. That was Friday night. On Saturday morning the plaintiff handed him the keys and told him to go to the store and open it and sell goods that day and close the store at night. The sales that day amounted to between six and seven dollars. On Monday he again went to the store and put some posters in the window advertising an auction sale of the goods and boxed the showcases and goods that she did not wish to sell at auction " or put them in a convenient place out of the way." Denny, who had been a clerk, assisted in so doing. Bancroft boxed up some of the goods and the showcases, and Tuesday he left town and did not return until Wednesday evening.

In February, 1896, Bancroft made a general assignment for the benefit of his creditors, and in June, 1896, he regained possession of the stock and continued conducting the business in his name from that date until he made the sale to the plaintiff. His signs were on the awning and on the front door and they were not removed at the time he attempted to make the sale to the plaintiff. On March 12, 1897, his stock " had run down considerably " and it was lower than it ever

had been before. The first discussion which he had with the plaintiff about selling these goods to her was about two weeks before. He was then being pressed by his creditors; "there were some accounts in the hands of different attorneys that had been presented to me (him) for payment, but not many  *  *  *  the bills were due." He testified: "I had every reason to believe that suits would soon be commenced. I do not think any suits had been commenced against me. I cannot say positively whether summons in suits from places outside of Waterloo had been served upon me, but cannot swear that there had not.  *  *  *  I told her the only way I could pay her would be to sell her these goods. That took place at the house. I can't say whether my wife was present or not. The fact was talked over that business was exceedingly quiet and business was not large. I said I didn't think I was making anything.  *  *  *  We began to talk about it two or three weeks before the inventory began to be taken. She first began talking about getting her pay. I did not say anything about giving her a bill of sale when she first talked.  *  *  *  I don't know as I could tell why it was not done at once, when we first talked. I talked about my indebtedness to her.  *  *  *  She said something must be done at once. That was during that two or three weeks. I very much hated to give her a bill of sale.  *  *  *  I commenced to take an inventory a week before the bill of sale was executed, and kept the store open all the time and sold to customers.  *  *  *  This took about a week. We occasionally sold articles which we had inventoried.  *  *  *  Mrs. Brown was there none of the time and my wife was there most of the time. We took the inventory by taking the packages down and counting them, and I took a piece of paper and marked the number of pieces in it, and put it in the package. If a garment was taken out and sold this paper was taken out and changed.  *  *  *  After I had executed it I acknowledged it before the notary public, and handed it to Mrs. Brown at the store.  *  *  *  Then she and I proceeded to my house. Before I went I locked up the store and handed the keys to her. Mr. Charles Opdyke was there.  *  *  *  When morning came I went back to the store and opened the store. The clerk was present there that day. We sold goods as usual to anybody who wanted them. That continued during the day. At night

I closed up when it came time and went home, and took the key of the store with me.   *   *   *   Sometime on Monday morning I went to the store.   That was the morning of the 15th.   *   *   *   After that Saturday I did see some of that stock of goods at my house. That was on Wednesday evening, the 17th.   There were some goods wheeled from the store in a cart.   It was on Wednesday evening or Thursday.   We borrowed a cart from Mr. Selmser and wheeled them to the house.   That was half-past nine or ten o'clock.   Not a very dark night.   *   *   *   On Saturday was the only time after the bill of sale that my store was open for business.   I made the big poster on Monday.   I made more than one poster."

At the time the bill of sale was executed by Bancroft he was indebted to several other parties.   His rent was some four months overdue, and he was indebted for coal which he had had for his house and store.

Opdyke testified that he drew the bill of sale, and that, " After the delivery of the bill of sale, the store was locked up by Mr. Bancroft, and the keys handed over to Mrs. Brown at the store, in the evening of March 12th."

Plaintiff was sworn as a witness, and testified that she lived in the family of Mr. Bancroft, and that she was at the store on Friday evening when the bill of sale was delivered to her.   " After that Mr. Bancroft locked the store and gave me the keys, and we went home.   I retained the keys until the next morning and then I gave them to him, and directed him to go to the store as usual."   She testified : " I took the bill of sale to pay me in part for the money I had advanced to him."   She does not testify, nor is there any proof, that any receipt was given or that any indorsement was made upon any notes of the amount mentioned in the bill of sale, nor were any notes or evidences of indebtedness against Bancroft produced in behalf of plaintiff · upon the trial.

The defendant as a witness testified that he went to the store on Monday, and that he found Mr. Bancroft and Denny in the store packing up goods; that he rapped at the window and asked them to let him in, and that they put up a paper so he could not look in.   The defendant was a constable, and received attachments and executions against Bancroft, and, in virtue thereof, made a levy upon a portion of the goods found in the store, and for such levy and seizure

by the defendant this action is brought, the defendant alleging in his answer that the goods taken by him "were the property of the said William G. Bancroft, and this defendant attached, levied upon and sold a part of said goods by virtue of said attachments and executions against the said William G. Bancroft, and that his said acts under said attachments and executions constitute the same transactions alleged in the complaint herein." In the answer it is further alleged that the bill of sale to the plaintiff "was wholly fraudulent and void as against the creditors of said Bancroft, and especially as against said George W. Phelps and against this defendant, and that said goods at the time of said attachment were the property of the said William G. Bancroft." At the close of the evidence the plaintiff asked the court to hold that there was no question for the jury, except as to the value of the property. "Defendant asked leave to go to the jury upon the question as to whether there was an immediate delivery and an actual and continued change of possession." The request was denied and the defendant took an exception.

In the course of the charge delivered by the court to the jury, he observed: "The only question for you is the value of this property. For the amount you find the value to be, you will render a verdict for the plaintiff, with interest from the 17th of March, 1897." Thereupon the defendant "asked the court to charge that as to whether there was an immediate and an actual and continued change of possession was a question which the jury must decide upon the evidence." The request was denied and the defendant took an exception. The defendant also excepted to the charge "that by the delivery of the key there was an immediate delivery of the goods as plain and notorious as there could be." He also excepted "to the charge that all the evidence showed that she took immediate delivery of this property, and that there was an actual and continued change of possession."

In *Tilson* v. *Terwilliger* (56 N. Y. 273) it was said that a sale of chattels must be accompanied by a continued change of possession to avoid the presumption of fraud. In that case it was held that, "although the sale be accompanied by immediate delivery and followed by an actual change of possession, yet if thereafter, however long may be the interval, it come again into the possession of the vendor by the act, or with the knowledge and assent of the vendee,

with no intermediate change of title, the presumption of fraud arises, and it devolves upon the vendee to show that the transaction was in good faith and without intent to defraud. The length of time between the sale and the coming again of the property into the possession of the vendor is immaterial, save as a circumstance to be considered by the jury on the issue of good faith and absence of intent to defraud. Where, in an action between the vendee and a creditor of the vendor to determine the title of the former to the property purchased, upon the one side is this statutory presumption of fraud, and on the other the testimony of the vendee tending to repel such presumption, the question is one of fact for the jury, and should not be taken from them and passed upon by the court as a question of law."

In *Bagley* v. *Bowe* (105 N. Y. 179) ANDREWS, J., said : " The question whether the judge was authorized to take from the jury the question of fraudulent intent arising upon the extrinsic facts is to be determined in view of the settled rule that to justify the court in directing a verdict in any case upon the facts, the evidence must be undisputed, or so certain and convincing that no reasonable mind could come to but one conclusion. If there is ground for opposite inferences, and a conclusion either way would not shock the sense of a reasonable man, then the case is for the jury, although the judge may entertain a clear and decided conviction that the truth is on this or that side of the controversy." That same learned judge added : " In a case which of right is triable by jury, the court cannot take from that tribunal the ultimate decision of the fact, unless the fact is either uncontradicted or the contradiction is illusory, or where, to use a current word, the answering evidence is a ' scintilla ' merely."

The doctrine laid down in *Tilson* v. *Terwilliger* (*supra*) was quoted and followed in *Wallace* v. *Nodine* (10 N. Y. Supp. 919), and in *Woodworth* v. *Hodgson* (9 id. 751). In the latter case the learned judge delivering the opinion, said : " The testimony of these two witnesses, father and son, even if they had not been interested in the event of the action, was of such a character, in the most favorable construction of it, as to require the same to be submitted to the jury, and for them to determine whether or not there was an actual change of possession."

In the case in hand, the testimony as to whether there was an immediate change of possession came from the witness Bancroft and the plaintiff under such circumstances as to warrant the trial judge in submitting to the jury the question of the credibility of such witnesses.

We think the learned trial judge fell into an error in refusing to submit the questions of fact arising upon the evidence to the jury.

The defendant's exceptions should be sustained and the verdict set aside and defendant's motion for a new trial granted, with costs to the defendant to abide the event.

All concurred.

Defendant's exceptions sustained, verdict set aside and defendant's motion for a new trial granted, with costs to the defendant to abide the event.